413 S.E.2d 679

**James T. WOLFE, Plaintiff Below, Appellee,**

v.

**A.E. KALMUS, Judith Lynn Rogers, Curtis Sutphin, and Calvin Sutphin, Defendants Below,**

**Curtis Sutphin and Calvin Sutphin, Defendants Below, Appellants.**

**No. 19759.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1991.

Decided Dec. 17, 1991.

Rehearing Denied Feb. 13, 1992.

---

Jack W. DeBolt, Charleston, for James T. Wolfe.

Thomas P. Maroney, Charleston, for Curtis Sutphin and Calvin Sutphin.

WORKMAN, Justice:

This is an appeal by Calvin Sutphin and Curtis Sutphin from a final order of the Circuit Court of Kanawha County affirming a jury verdict of $70,000 plus prejudgment interest of $19,999.24 in favor of the appellee, James T. Wolfe. The appellants contend that the lower court committed various errors which justify reversal on appeal. We conclude that the jury did not receive adequate instructions regarding the remedies available to the appellee and the factors to be considered in determining whether such remedies were applicable to the present case. We therefore reverse and remand for a new trial.

### I.

The appellee James Wolfe initiated civil action in the Circuit Court of Kanawha County on August 11, 1986. The appellee alleged that he had given $70,000 to the appellant Curtis Sutphin for the purchase of real estate located in Marmet, Kanawha County, West Virginia, on which is situated a business known as The Canary Cottage. The appellee alleged that despite his contribution of $70,000 toward the purchase of the property, owners Calvin and Curtis Sutphin entered into a written lease/purchase agreement dated December 13, 1985, with Ms. Judith Lynn Rogers.[1] Although the appellee received no interest in the property, his $70,000 was not returned to him. He therefore asserted that the appellants were indebted to him in the amount of $70,000.

Calvin and Curtis Sutphin jointly owned the tract in question and had leased the commercial structure known as The Canary Cottage to various others for the operation of a restaurant. Art Kalmus, Ms. Rogers' husband, had rented The Canary Cottage from the Sutphins and had operated the restaurant. The appellee was a frequent patron of the restaurant and maintained a personal acquaintance with Art Kalmus and Judith Rogers. Art Kalmus died on October 18, 1987, but his deposition had been taken and was used as evidence at trial. Mr. Kalmus testified that he had borrowed money from the appellee to be used in remodeling The Canary Cottage and further testified that the appellee had provided the $70,000 which was transferred to the Sutphins in the initiation of the lease/purchase agreement of December 13, 1985. Mr. Kalmus indicated that he had informed the Sutphins that the $70,000 was borrowed, but did not tell them that the money had been provided by the appellee.

The actual exchange of the $70,000 cashier's check allegedly occurred through the assistance of Ms. Blanche Cooper, a cook at The Canary Cottage. Moreover, the cashier's check had a notation on it indicating Blanche Cooper's name. The appellee had apparently relied upon Ms. Cooper for financial assistance, had opened a joint-checking account with Ms. Cooper, and had provided her with power of attorney. Although Ms. Cooper actually delivered the $70,000 cashier's check, neither she nor the appellee participated in the negotiations between the Sutphins and Ms. Rogers or the preparation of the lease/purchase agreement.

The appellee testified that he and Mr. Kalmus had several discussions in late 1985 regarding the potential purchase of The Canary Cottage from the Sutphins. The appellee further testified that Mr. Kalmus had informed him that he would become a co-owner of the business. Mr. Kalmus, however, denied having made such a statement. It appears that the appellee's involvement in the transaction was almost exclusively accomplished through Mr. Kalmus and Ms. Cooper. The appellee apparently had no conversation with the Sutphins regarding the transaction until three weeks prior to trial. At that time, the appellee testified that he informed Curtis Sutphin that he had "spent a large sum of money for remodeling" and that his "name ought to be put on there."

The testimony of Ms. Cooper with regard to her role in the negotiations was quite equivocal. At trial, she testified that she had no recollection as to what was contained in the power of attorney, stated that she never exercised the power of attorney on behalf of the appellee in the negotiation of The Canary Cottage transaction, and answered in the negative when asked whether she negotiated with the Sutphins on behalf of the appellee for the sale or purchase of any land. In her deposition, however, Ms. Cooper indicated that she

---

1. The December 13, 1985, lease/purchase agreement provided that in the event Judith Rogers should default, all monies paid were to be treated entirely as rent, and no sum of money was to be returned by the Sutphins to Judith Rogers. Under the terms of the agreement, Ms. Rogers agreed to lease the premises for a period of 48 months for the sum of $180,000, with $70,000 to be paid on December 13, 1985, $10,000 on December 13, 1986, and 47 monthly payments of $1,168.19, the 48th payment to be a balloon payment. If all terms were met, the Sutphins agreed to convey the property to Ms. Rogers by general warranty deed.

was a business associate of the appellee and "tried to help him take care of his money and put it where [she] thought it would draw interest and help him out." Moreover, when asked in her deposition whether she made some purchase of real estate on the appellee's behalf, she answered, "Seventy thousand dollars worth to buy real estate up there at The Canary Cottage."

With regard to the delivery of the $70,000 from the appellee, Ms. Cooper testified that she took the check to The Canary Cottage and handed it directly to Curtis Sutphin. She testified that she told Mr. Sutphin "[h]ere's the check." "You'll have a new partner." She also testified that she indicated that the new partner would be the appellee. Ms. Cooper also stated that she had previously mentioned to one of the Sutphins that the appellee was "going into partnership."

The trial court advised the parties, after the conclusion of the evidence, that it was sitting as a court in equity and that the jury's verdict would be treated as an advisory verdict. The jury returned a verdict of $70,000 plus $19,999.24 prejudgment interest against the Sutphins and a verdict of $69,000 in compensatory damages, $10,000 for emotional distress, and $20,821.77 in prejudgment interest against Ms. Rogers based upon the money contributed by the appellee for remodeling of The Canary Cottage. The trial court adopted the findings of the jury and entered its judgment accordingly. The Sutphins now appeal that determination of the lower court.

The Sutphins contend that the lower court erred in the following manner: 1) the lower court erred by requiring the Sutphins to pay the appellee $70,000 plus prejudgment interest, contending that there was no basis in law or in equity for the rescission or reformation of a contract between the Sutphins and the appellee since no such contract existed; 2) the lower court erred by reforming or rescinding without a showing of mutuality of mistake or mis-

take by one party and fraud by the other; 3) the lower court erred in refusing to grant the Sutphins' motion to set aside the verdict; 4) the lower court erred in refusing to allow the testimony of Ms. Mary Dawson, retired postmistress of Winifrede Post Office, who would have testified that Ms. Cooper was discharged as a clerk of the post office for dishonesty; 5) the lower court erred in giving plaintiff's instruction No. 5 which did not instruct on mutual mistake but only unilateral mistake of the appellee; 6) the lower court erred by waiting until the conclusion of the evidence to inform the parties that it was sitting as a court in equity and failed to make specific findings of fact and conclusions of law.[2]

## II.

The appellants premise much of their argument upon the lack of any contractual agreement between them and the appellee. This fact is not in dispute, and we will therefore not involve ourselves in great discourse in that regard. It is recognized at the outset that no contract, in any form, existed between the Sutphins and the appellee. Likewise, as the Sutphins contend, it is an exercise in futility to attempt to discuss reformation or rescission of a nonexistent contract. The Sutphins devote a substantial portion of their brief to a recitation of the law of reformation and rescission in an attempt to demonstrate the lack of applicability of those principles to the present case. We agree with the Sutphins' contentions pertaining to that matter.

As asserted by the appellee, this is a matter of restitution or implied contract. We discussed the equitable principle of restitution in *Prudential Ins. Co. of America v. Couch*, 180 W.Va. 210, 376 S.E.2d 104 (1988). Syllabus point 4 of *Couch*, 180 W.Va. 210, 376 S.E.2d 104, explains the following:

It is generally recognized in the law of restitution that if one party pays money to another party (the payee) because of a

---

**2.** Because we decide this matter on the basis of inadequacy of jury instructions, we do not ad- dress the appellants' other assignments of error.

mistake of fact that a contract or other obligation required such payment, the party making the payment is entitled to repayment of the money from the payee. Syllabus point 5 of *Couch* states, "A suit for restitution may not be maintained against a party who is not the payee, unless it is shown that such party was unjustly enriched because the payment satisfied an obligation that was the responsibility of such party." *Id.*

However, this case is not a simple model for the application of the principles of restitution. It is complicated by the fact that a valid contract existed between Judith Rogers and the Sutphins which required Judith Rogers to continue making the stated payments toward the acquisition of the property in question. The supportive language of that contract, as referenced above, provided that if Judith Rogers failed to make such payments, the contract would no longer be in effect and, moreover, that the Sutphins would be under no obligation to repay any monies previously advanced to them. Thus, to elevate the appellee to a position in which he could recover his $70,000 would be to place him in a much better position than he would have occupied had he been an actual party to the contract. The operative facts of this exchange are as follows: Money was provided by the appellee to Art Kalmus for use in a contractual relationship between Kalmus' wife and the Sutphins. Judith Rogers subsequently defaulted upon the contract between her and the Sutphins, and the property was vested in the Sutphins with no obligation to repay Judith Rogers for monies already transferred. The appellee was not a party to that contract between Judith Rogers and the Sutphins. Furthermore, the contract contained the forfeiture provision referenced above and provided that Judith Rogers was not entitled to recover any monies as purchaser upon her default. We addressed such forfeiture provisions in *Stonebraker v. Zinn*, 169 W.Va. 259, 286 S.E.2d 911 (1982). In *Stonebraker*, we explained that the vendor may, in some instances, be held to have received a "grossly disproportional sum." 169 W.Va. at 270, 286 S.E.2d at 917. "The test is essentially an equitable one to determine if the total amount retained by the vendor is grossly disproportional to the fair rental value of the property and other expenses incurred by the vendor resulting from the purchaser's default." *Id.* This issue was not raised by the parties at the lower court level and will therefore not be resolved here.

▮▮▮ Of more significance, however, is the inadequacy of the presentation of the issue of restitution. The jury was instructed on such issues as mistake of fact, negligence, partnership, elements of a binding contract, fraudulent misrepresentation, emotional distress, etc. It was not, however, properly instructed on the remedy of restitution. No instruction was given which squarely addressed the remedy of restitution and its elements. We explained in syllabus point 1 of *State v. Martin*, 177 W.Va. 758, 356 S.E.2d 629 (1987) that " '[w]hen instructions are read as a whole and adequately advise the jury of all necessary elements for their consideration, the fact that a single instruction is incomplete or lacks a particular element will not constitute grounds for disturbing a jury verdict.' Syllabus Point 6, *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976)." When, however, instructions read as a whole do not adequately advise the jury of all necessary elements for their consideration, the jury verdict is not supported, and the matter must be remanded for a proper trial. As we recognized in *Adkins v. Whitten*, 171 W.Va. 106, 109, 297 S.E.2d 881, 884 (1982),

> ... it is incumbent on the court by way of instruction or charge to inform the jury as to the law that is applicable to the facts of the case.... We have consistently held that a trial court has a duty to give a proper instruction relating to an appropriate legal theory that is supported by the facts of the case. *E.g., Abdulla v. Pittsburgh and Weirton Bus Co.*, [158] W.Va. [592], 213 S.E.2d 810 (1975); *Brown v. Crozer Coal & Land Co.*, 144 W.Va. 296, 107 S.E.2d 777 (1959); *DeLuz v. Board*, 135 W.Va. 806, 65 S.E.2d 201 (1951); *Morris v. Parris*, 110 W.Va. 102, 157 S.E. 40 (1931).

The jury in the present case was appropriately presented with the facts, but it was expected to resolve those facts and arrive at a resolution without the benefit of proper legal instructions. A jury cannot be expected to adequately complete its assignment in the absence of sufficient instructions regarding the law to be applied to the facts.

■ Although this Court has not squarely addressed the issue, we recognize that several jurisdictions have held that any error in instructing an advisory jury is harmless since the verdict of an advisory jury is not binding on the trial court. *See e.g., In re Estate of Konow,* 154 Ill.App.3d 744, 748, 106 Ill.Dec. 743, 745, 506 N.E.2d 450, 452 (1987); *Aetna Life and Casualty Co. v. Ashe,* 88 Or.App. 391, 395, 745 P.2d 800, 802 (1987) *review denied,* 305 Or. 103, 750 P.2d 497 (1988); *Butcher v. McGinn,* 706 P.2d 878, 881 (Okla.1985). However, where the erroneous instructions indicate that the manner in which the trial judge viewed the law was also erroneous, the erroneous instruction will be considered reversible error. *See Murdock–Bryant Constr., Inc. v. Pearson,* 146 Ariz. 57, 703 P.2d 1206 (1984). As explained in *J.C. Jacobs Banking Co. v. Campbell,* 406 So.2d 834, 848 (Ala.1981), "alleged errors in instructions to a jury are not grounds for reversal where the verdict is purely advisory and the trial court makes its own independent findings ... on evidence sufficient to sustain the judgment, unless it is obvious from the instructions that the trial court was operating under a basic misconception of the governing law." *See also Autenreith v. Norville,* 127 Ariz. 442, 622 P.2d 1 (1980); *King v. H.J. McNeel, Inc.,* 94 Idaho 444, 489 P.2d 1324 (1971). We believe that such basic misconception is evidenced in the present case by the instructions given to the advisory jury, and we therefore find reversible error.

On remand, the jury must hear the facts regarding the $70,000 by the appellee to Art Kalmus and the installment contract executed between Judith Rogers and the Sutphins. The terms of that installment contract must necessarily be evaluated due to the contract's effect on a determination of whether the Sutphins were unjustly enriched. Furthermore, the jury must be provided with all facts surrounding the appellee's conduct regarding the money and his belief concerning its use. The jury must then be properly instructed regarding the remedy available to the appellee and must be advised of the legal parameters of the principle of restitution. Having been so instructed, the jury must then determine whether restitution is advisable under this factual scenario.

We decline to resolve this matter at this level due to the jury's findings below and the inadequacy of the instructions provided to the jury. When asked in jury interrogatories whether the Sutphins had either actual knowledge or reason to know that the appellee believed that he was to be personally a co-owner of the real estate when the $70,000 was paid to them, the jury underlined the words "reason to know" and answered in the affirmative. That finding could possibly have been instrumental in establishing entitlement to restitution if the jury had been properly instructed. We do not believe, however, that the jury's verdict can be upheld when the jury was not provided with the tools to properly assess the case. Consequently, we reverse and remand to allow an opportunity to provide the jury with adequate instructions on the remedy sought by the appellee and with the factors to be employed in assessing his entitlement to that remedy.

Reversed and remanded.